AO 91 (Rev. 11/11)  Criminal Complaint

SEALED

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

# FILED

FEB 1 3 2014

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| MARK JEFF ZELDES | ) | Case No.  5:14-mj-00003-JLT |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| _Defendant(s)_ | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___June 1, 2009, to the present___ in the county of ___Kern , Ventura, Los Angeles___ in the

___Eastern & Central___ District of ___California & elsewhere___ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 USC Sections 841(a)(1), 841(b)(1)(A) and 846 | Conspiracy to manufacture, to distribute, and to possess with intent to distribute 1,000 or more marijuana plants; Penalties:  mandatory minimum prison term of 10 years to life/$10 million fine |

This criminal complaint is based on these facts:

See affidavit attached hereto and incorporated by reference.

☑ Continued on the attached sheet.

_____
_Complainant's signature_

Randall Hoover, DEA Special Agent
_Printed name and title_

Sworn to before me and signed in my presence.

Date:  __2/13/14__

_____
_Judge's signature_

City and state:          Bakersfield, CA

Jennifer L. Thurston, U.S. Magistrate Judge
_Printed name and title_

## **AFFIDAVIT**

I, Randall Hoover, Special Agent, U.S. Department of
Justice, Drug Enforcement Administration (DEA), being duly sworn,
state:

## **EXPERTISE**

1.  I was hired by the DEA in September of 2004, and
attended the DEA Academy for sixteen (16) weeks of DEA Basic
Agent training at the Justice Training Center in Quantico,
Virginia.  At the DEA Academy, I was trained in all aspects of
conducting narcotics investigations.  I am familiar with
investigations of drug trafficking organizations, methods of
importation and distribution of controlled substances, and
financial investigations.  I have participated in numerous
narcotics investigations either as a case agent or in a
supporting role.  I have debriefed numerous defendants,
informants, and witnesses who had personal knowledge regarding
major narcotics trafficking organizations.  Additionally, I
have participated in many aspects of drug investigations
including undercover operations, physical and electronic
surveillance, arrests, extensive analysis of telephone billing
records for telephones used by narcotics traffickers, and
assisted in court ordered wiretaps.  I am familiar with
narcotics traffickers' methods of operation including the

1

manufacturing, distribution, storage, and transportation of narcotics, including, but not limited to, marijuana.  I am also familiar with the collection of money proceeds from narcotics sales and trafficking, and methods of money laundering used to conceal the nature of the proceeds.  I have been involved in investigations regarding the unlawful importation, possession, and distribution of controlled substances, as well as related money laundering statutes involving the proceeds of specified unlawful activities and conspiracies associated with criminal narcotics, in violation of Title 21, United States Code, §§ 841(a)(1), 843(b), 846, 952(a), 960, and 963, and Title 18, United States Code, §§ 1952, 1956 and 1957.

2.  As a result of my participation in this investigation, and through review and analysis of information received from various sources, including other law enforcement agencies, law enforcement investigators, and information yielded from law enforcement databases, I am familiar with all aspects of this investigation.  On the basis of this familiarity and other information which I have reviewed and determined to be reliable, I allege the following in support of the issuance of a criminal complaint.  This affidavit does not purport, however, to contain each and every fact known to me as a result of this investigation but rather sets forth sufficient

2

information to reach a determination that there is probable
cause to believe that Mark Jeff ZELDES, has conspired to
manufacture, to distribute, and to possess with intent to
distribute marijuana, a Schedule I controlled substance, in
violation of Title 21, United States Code, Sections 841(a)(1),
841(b)(1)(A), and 846.

**STATEMENT OF PROBABLE CAUSE**

3.   On February 8, 2010, Bakersfield Police Department
(BPD) Detective Mark Herman received information in the form of
a confidential anonymous tip regarding a large marijuana
cultivation operation in Bakersfield, California.   The
anonymous caller stated that s/he wished to report a marijuana
cultivation operation located in an old trucking yard on South
Union Avenue between one half mile and one mile south of Ming
Avenue.   The caller described the location as an old trucking
yard that is now a stone yard and stated that it is located on
the west side of South Union Avenue.

4.   After receiving the above tip, Detective Herman
responded to the location as described by the caller.
Detective Herman determined the location to be 1601 South Union
Avenue, Bakersfield, California.   Detective Herman found a
business sign posted at the front of the property at 1601 South
Union Avenue bearing the name "Phoenix Truck Repair."   The sign

3

is not affixed to any building located at that address. Detective Herman also saw an unmarked office building on the east side of the property. Detective Herman saw to the west of the office building an unmarked large, metal, industrial facility, later determined in the course of this investigation to be K&N Stone Manufacturing, as well as large piles of stone and rock, stacked on pallets to the front on the east side, along South Union Avenue.

5.    Between February 27, 2010, and March 8, 2010, BPD detectives conducted over 15 hours of surveillance at 1601 South Union Avenue.  During surveillance, the detectives found no activity consistent with a truck repair business.  It appeared to the detectives that Phoenix Truck Repair was defunct.  In addition, there were no stone or rock deliveries to the property and no ostensible stone or rock business being conducted at the office building.  Further, during this time, only one pickup truck on two separate occasions entered the property and obtained a load of stone/rock, which was placed in the bed of the truck.  The driver of the pickup did not, however, make contact with any person at the office building. Instead, the driver made contact with an unidentified Hispanic male, who used a forklift to load the stone/rock into the bed of the truck.  During surveillance, Detective Herman observed

4

other Hispanic male subjects operating forklifts and moving
piles of stone and rock around the yard on the western end of
the property.  At no time, however, did any of these subjects
enter the office building, nor did it appear that they had any
association with the office building.

6.   On March 3, 2010, at approximately 1:30 p.m.,
Detective Herman, acting in an undercover capacity posing as a
potential customer interested in purchasing several pieces of
stone/rock, arrived at the location and approached the furthest
west door on the south side of the office building.  Detective
Herman knocked on the door and attempted to open it but found
it was locked and no one opened the door from the inside.
During that time, while standing at the door, Detective Herman
could smell the overwhelming odor of fresh marijuana emitting
from the office building.  Also, while standing at the door,
Detective Herman observed through the south facing windows,
reflective Mylar sheeting covering the windows.  I know, based
on my training and experience, that Mylar sheeting is commonly
used in indoor marijuana cultivation operations to maximize
reflectivity and to conceal indoor grows from outside
detection.

7.   After receiving no answer at the door, Detective
Herman walked west on the property towards the industrial

5

facility and contacted an unidentified Hispanic male who was operating a forklift.  Detective Herman explained to the Hispanic male that he wished to purchase several pieces of flagstone.  The Hispanic male told Detective Herman that they do not sell stone from this location and that this location is only used for stone storage.  Detective Herman asked if he knew where stone could be purchased and the Hispanic male stated that he did not know.

    8.  On March 8, 2010, Detective Herman was able to obtain a search warrant for the office building only at 1601 South Union Avenue, Bakersfield, California, authorized on March 8, 2010, by the Honorable Kern County Superior Court Judge Michael B. Lewis.

    9.  On March 9, 2010, at approximately 9:00 a.m., BPD detectives, DEA agents and agents from the Southern Tri-County High Intensity Drug Trafficking Area (STC-HIDTA) executed a search warrant at the office building located at 1601 South Union Avenue, Bakersfield, California.  During the execution of the warrant at the office building, law enforcement officers found approximately 1,161 marijuana plants, 54.8 pounds of processed marijuana, and an indoor marijuana cultivation operation.  Officers also found copies of purported medicinal marijuana recommendations and driver licenses for purported

patients.  Dustin YORK, Mark McGRATH, Joseph TAYLOR, and Jeremy
DUNN were found inside the office building.  Each of these men
emitted an odor of marijuana.  YORK, McGRATH, TAYLOR, and DUNN
were initially arrested for violations of California Health and
Safety Code Sections 11359, possession of marijuana for sale;
11358, cultivating marijuana, and 11379.6, manufacture of
marijuana, and were taken into custody.

    10.  Following advice and waiver of his Miranda rights,
McGRATH identified his boss and owner of the indoor cultivation
as Mark ZELDES, who brought the medicinal marijuana
recommendations to the office building.  McGRATH said that he was
hired as a "gardener" by ZELDES in July, 2009, to tend to the
indoor cultivation.  McGRATH stated that ZELDES had paid for
McGRATH to move from Florida to Bakersfield, California and paid
his first and last month's rent for his current residence.
McGRATH said that he is paid $800 per week to tend to the garden.
McGRATH said that he met and has been friends with ZELDES since
after graduating high school.  McGRATH stated that ZELDES is
about 48 to 49 years old, is a contractor and, at that time,
resided in Newbury Park, California.  McGRATH stated that ZELDES
owns a business he identified as "A Cut Above."  When McGRATH was
further questioned about how he was paid and who paid him,
McGRATH replied, "I'd rather not say" and suggested the indoor

cultivation had a second owner besides ZELDES.  When Detective

Herman asked McGRATH if Joseph NOLAN was the second owner,

McGRATH nodded yes.  McGRATH stated that NOLAN might have a key

to the office building where the indoor cultivation was located.

McGRATH then advised that he knew of another indoor marijuana

grow operation behind the "Blue Banana," a medical marijuana

dispensary located off of Parthenia Avenue in southern

California.  McGRATH could not recall if the grow location was

attached to or in a building directly behind the Blue Banana.

McGRATH said he was there once about five months ago and noted

the indoor cultivation operation had about fifty marijuana

plants.  McGRATH heard that the indoor cultivation affiliated

with the Blue Banana had harvested significant amounts of

marijuana since his last visit.  McGRATH stated he thought that

ZELDES is the owner or is somehow affiliated with the Blue Banana

indoor marijuana cultivation.

    11. YORK also made a statement following advice and waiver

of his Miranda rights.  YORK said the actual owners of the indoor

cultivation were Mark ZELDES and NOLAN.  YORK said that ZELDES

owns a tile company he identified as "A Cut Above."  YORK said

that NOLAN generally paid him $500 in cash every Tuesday.  YORK

stated they previously had a yield of approximately seventeen

pounds during the first harvest.

8

12. Prior to completion of the search of the office building, a fifth individual, Joseph NOLAN, was located and detained outside. NOLAN was observed walking on foot between the office building and the large, metal, industrial facility. Detective Herman asked NOLAN what he was doing at 1601 South Union Avenue. NOLAN stated that he owns Cross Creek Building Center in Malibu, California. NOLAN also stated that his business takes orders for stone-related items used in various construction ventures. NOLAN stated that, when he receives an order for stone or rock, he would send his order to K&N Stone Manufacturing at 1601 South Union Avenue, where K&N Stone Manufacturing would then cut and manufacture the stones to his specifications. Detective Herman asked NOLAN if he knew who owns the property at 1601 South Union Avenue. NOLAN stated that it is owned by BK Holdings. However, the property is leased by K&N Stone Manufacturing. Detective Herman then asked NOLAN, if he knew who owns K&N Stone Manufacturing. NOLAN indicated that he did not. Detective Herman asked NOLAN if he knew who was responsible for paying the utilities, to include gas, electric and water, for 1601 South Union Avenue, and NOLAN stated that he did not know. It was later determined that NOLAN's wife, in fact, paid the utilities for 1601 South Union Avenue through K&N Stone Manufacturing. In addition, NOLAN

9

indicated that he was not aware of the activities at the office
building.  Detective Herman asked NOLAN if NOLAN had any
knowledge regarding the activities within the office building
at 1601 South Union Avenue and NOLAN stated that he did not.
NOLAN was then asked if he knew any of the persons conducting
business out of the 1601 South Union Avenue office building and
NOLAN stated that he did not.

    13.  The same day, Detective Herman wrote a search warrant
for 6614 Tamarind Street, Newbury Park, California, the
residence of Joseph NOLAN.  During the search of that location,
DEA Resident Agent in Charge ("RAC") Mike Quinn advised NOLAN
as to the nature of the investigation.  Upon advice and waiver
of his Miranda rights, NOLAN admitted that he was aware of the
marijuana cultivation operation at 1601 South Union Avenue,
Bakersfield, California.  NOLAN stated that an acquaintance of
his, Mark ZELDES, was responsible for the operation.  After
making this statement, NOLAN told RAC Quinn that he wanted to
speak to an attorney and all questioning of NOLAN was
discontinued.

    14.  During the search of NOLAN's residence, Detective
Herman located and seized NOLAN's wallet from the kitchen
counter.  In the wallet was a piece of paper labeled "A Cut
Above," detailing amounts spent and received from August 25,

2009, through January 19, 2010, consistent with a pay/owe sheet. Also found on this document was the entry "1-Jan check 1075 The Electric Co. $2,595.00 Blue Banana."

15.   On April 1, 2010, a federal grand jury in Fresno returned an indictment charging NOLAN, McGRATH, TAYLOR, YORK and DUNN with violations of Title 21, United States Code, Sections 841(a)(1) and 846.  The state charges were dropped in favor of federal prosecution.

16.   On May 3, 2010, I seized the marijuana cultivation equipment located at 1801 South Union Avenue, Bakersfield, California.  I noticed that two grow light housings contained Ventura County Sheriff's Department Evidence labels relating to a case against ZELDES stemming from 2009.  I contacted the Ventura County Sheriff's Department regarding the investigation in 2009, and determined that on July 7, 2009, Ventura County deputies had responded to a restraining order violation between Mark ZELDES and his girlfriend, Heather SLAYBACK, and while doing so, discovered an indoor marijuana cultivation at 2286 Adrian Street, Newbury Park, California.  While at the location, deputies contacted Heather SLAYBACK who stated that Mark ZELDES was her fiancé and that both of their names were on the title deed of the property as of approximately seven years ago.  SLAYBACK stated that there was a marijuana cultivation in

a locked bedroom and gave permission to enter.  However,
SLAYBACK did not have a key to the locked door.  SLAYBACK
stated that approximately four days ago she had moved out of
the residence as a result of the domestic violence leading to
the restraining order.  However, she indicated that she had
recently moved back into the residence.  SLAYBACK stated that
the marijuana cultivation belonged to ZELDES and she wanted it
removed because of the temporary restraining order that she
planned to make permanent in the next few days.  SLAYBACK
stated that ZELDES sold the marijuana to a cannabis club called
"TOP's."  Subsequently, after a deputy explained the
admonishments on a Ventura County Sheriff's Department consent
form, SLAYBACK stated she understood and signed the consent
form allowing deputies to forcibly open the bedroom door.  Upon
entry into the room, deputies found approximately 51 mature and
approximately 229 immature marijuana plants in addition to grow
room equipment, a $CO_2$ machine and grow lights and a ballast –
all of which were seized and booked into the Ventura County
Sheriff's Department at the East Valley Station.

17.  On July 14, 2009, Ventura County Sheriff's deputies
contacted ZELDES regarding the marijuana found at his
residence.  ZELDES stated that he had 865 people in his
collective and also had recommendations for all of them posted

12

in the cultivation room.  ZELDES also stated that he had
paperwork from "The Organic Pharmacy" (TOP) in Venice,
California authorizing him to cultivate marijuana for the
collective.  ZELDES stated that he had been cultivating
marijuana for the collective for approximately three months and
had received no profit.  ZELDES stated that he had provided
marijuana that he had cultivated to The Organic Pharmacy only
once.  ZELDES stated that the lock on the cultivation room door
was not recently placed there and that SLAYBACK had a key.
ZELDES also stated that SLAYBACK was lying to deputies as he
had copies of the recommendations posted in the cultivation
room and that SLAYBACK must have removed them prior to the
deputies arriving at the residence.  Subsequently, at the time
of the search warrant, deputies seized the marijuana and
cultivation equipment.  However, since it appeared that ZELDES
was operating under the guise of California medical marijuana
law, charges were not brought against ZELDES by the Ventura
County Sheriffs' Department.

18.  On June 3, 2010, in exchange for judicial
consideration, NOLAN, in the presence of his attorneys, told
the government and its agents that he met ZELDES approximately
five years ago in the course of his stone manufacturing
business.  NOLAN stated that ZELDES was a tile and marble

13

contractor who had purchased materials from NOLAN's company. NOLAN stated that ZELDES approached him and informed him that there was a marijuana dispensary in Malibu, California, that was closing down and ZELDES was interested in reopening it. However, it was too close to a school. ZELDES asked NOLAN his thoughts about opening a marijuana dispensary at NOLAN's business, Cross Creek Building Materials, located at 3730 Cross Creek Road, Malibu, California. NOLAN stated that ZELDES was growing marijuana at ZELDES' residence located in Newbury Park, California. NOLAN went over to ZELDES' residence and observed ZELDES' marijuana cultivation operation. ZELDES also showed NOLAN marijuana recommendations and told NOLAN that ZELDES could hook NOLAN up.

19. In June 2009, NOLAN and ZELDES met at the vacant office building leased by NOLAN's company, K&N Stone Manufacturing located at 1601 South Union Avenue, Bakersfield, California, to look at the facility. NOLAN stated that ZELDES could supply all of the expertise and equipment to get the marijuana cultivation going and indicated that ZELDES intended to get the cultivation up and running, then convert the location into a marijuana dispensary. NOLAN stated that ZELDES had a few locations where residences were converted into marijuana cultivation operations where the growers lived at the

14

location.  NOLAN stated that ZELDES had proposed a partnership
where NOLAN would provide the funding for building out the
location and ZELDES would teach/show NOLAN how to conduct a
marijuana cultivation operation.  ZELDES would also provide the
business connections for the purpose of selling the marijuana.

20.  NOLAN stated that in July, 2009, NOLAN had heard from
a contractor who knew ZELDES that ZELDES had been arrested for
a marijuana cultivation.  NOLAN stated that ZELDES contacted
NOLAN and stated the circumstances surrounding ZELDES' arrest.
NOLAN stated that approximately a week later ZELDES met with
him and stated that a neighbor turned ZELDES in while moving
marijuana plants in and out of his residence.  ZELDES was able
to retrieve the cultivation equipment and marijuana back from
the Ventura County Sheriff's Department.  NOLAN stated that
after ZELDES showed NOLAN the Ventura County Sheriff's
Department evidence labels on some of the grow equipment, NOLAN
agreed to partner with ZELDES in the marijuana cultivation
operation, as NOLAN believed that it must be lawful; otherwise,
the Sheriff's Department would not have returned the
cultivation equipment.

21.  NOLAN stated ZELDES sold marijuana to numerous
marijuana dispensaries in the Los Angeles area.  ZELDES told
NOLAN about a dispensary called the "BLUE BANANA" that had a

marijuana cultivation operation connected to it. NOLAN stated that the BLUE BANANA had a two-story 1,000 square foot operation with grow lights located in a warehouse. NOLAN stated that ZELDES also had two or three locations that were residences converted into cultivation operations where the growers lived at the location. NOLAN stated that the BLUE BANANA cultivation operation was approximately 10 times the size of the Bakersfield location. NOLAN stated that ZELDES was involved in two other marijuana cultivation operations and had an agreement to build/maintain a marijuana cultivation site inside of the BLUE BANANA. NOLAN stated that ZELDES made a deal with Irwin FEIGENBAUM, the owner of BLUE BANANA, for 50% of the profits, and ZELDES would perform the construction of the cultivation location at the BLUE BANANA. NOLAN stated that the BLUE BANANA needed cloned marijuana plants for its operation and that he had taken clones and samples to the cultivation site at the BLUE BANANA. NOLAN stated that ZELDES was connected to many individuals that knew the marijuana business.

22. On June 17, 2010, agents from the DEA Bakersfield Resident Office and detectives from the Bakersfield Police Department and the Kern County Sheriff's Office conducted surveillance of 18526 Parthenia Street, Northridge, California,

the suspected location of the dispensary known as the "BLUE
BANANA."  At that location, surveillance agents observed a
black Mercedes arrive and park in front of a black gate at the
front of the property.  A DMV records check indicated that the
vehicle was registered to an Irwin FEIGENBAUM with a listed
address in Thousand Oaks, California.  The driver then exited
the Mercedes, unlocked the gate, walked over to the glass door
at 18526 Parthenia, and opened the front door to the location
with a key. Subsequently, the driver exited the building
through the same door, appeared to lock the door, then walked
to and through the gate, appeared to lock the gate, entered the
Mercedes, and left the location.  Later, I identified the
individual through a DMV photograph as Irwin Joseph FEIGENBAUM.

     23.  On June 18, 2010, BPD Detective Brian Kennemer
located an article from Culture Magazine on the internet
containing an interview with FEIGENBAUM.  The article cited
Article 5.1 of Chapter IV of the Los Angeles Municipal Code and
stated that city officials had sent out a courtesy notice to
439 dispensaries that had registered with the city after the
moratorium date of November 3, 2007.  The article discussed the
closing of marijuana dispensaries in the Los Angeles area.  In
the article, FEIGENBAUM is quoted as saying, "I will be
following the dictates of what the city has ordered, and will

17

be closing by June 7."

24.   On September 16, 2010, at approximately 1:30 p.m.,
acting in an undercover capacity, I met with real estate agent,
Eli ANISHBAN, at 18526 Parthenia Street, Northridge,
California.  As ANISHBAN and I approached the glass doors to
suite 18518 and 18526, I detected a strong odor of marijuana
emitting from the glass doors.  As ANISHBAN opened the door to
suite 18518, I detected no change in the odor and determined
that the odor was emitting from suite 18526.  ANISHBAN and I
entered suite 18518 and conducted a walk-through of the
facility and I observed no marijuana cultivation operation.
Upon conclusion of the walk-through, ANISHBAN and I returned to
the area of the roll up door and spoke for a moment discussing
the property.  While in conversation regarding the property and
facing north towards Parthenia Street, I observed a white
Toyota pickup truck with a blue stripe, bearing California
license #7F28064, later determined to be registered to Davin
Gregory JONES with a listed address of 1300 N. Fairfax Avenue,
Apt #104, Los Angeles, California 90046, arrive and park in
front of the gate.  A white male, approximately 30 years old,
approximately 6' tall, approximately 180 pounds, and wearing a
visor style hat, whom I later identified as Davin JONES, as
discussed below, exited the vehicle, approached, unlocked and

opened the gate, then drove the truck into the parking lot, then walked back, closed and locked the gate. I asked ANISHBAN if the driver of the white Toyota pickup truck was the property owner. ANISHBAN stated that he was a tenant at the other suite (18526 Parthenia Street). I informed ANISHBAN that I was under the impression that the other suite was available for rent. ANISHBAN stated that the tenants were still there and would be out in a few months. He further indicated that the suite used to house a marijuana dispensary and the city had forced them to close. I told ANISHBAN that I smelled marijuana when I entered the building. ANISHBAN laughed nervously, agreed, and gave a gesture (put his hands up, tipped head and rolled his eyes) that he did not want to be involved. ANISHBAN asked me if I liked the space and if I wanted to review a lease document. I replied yes and ANISHBAN momentarily departed and retrieved one from his vehicle. While doing so, I walked back through the building to the front glass doors, and upon approaching, observed the white Toyota pickup truck parked in front of the building. As I exited the building, I observed the white male driver of the Toyota pickup truck appear out of the glass door to the front of the 18526 suite, turn and use a key to lock the door. During this time, I detected the scent of marijuana, stronger than previously detected. I struck up a brief

conversation with the white male and while doing so, he
informed me that his name was "DAVIN."  I later identified
DAVIN as Davin Gregory JONES from a California DMV photograph.
After the conversation between JONES and I concluded, I re-
entered suite 18518.  Moments later, after receiving a copy of
a lease agreement from ANISHBAN, I concluded conversation with
ANISHBAN and left the location.

25.  On September 21, 2010, I received information from
the Los Angeles Department of Water and Power (DWP) Revenue
Security Department which provides utility services to
Northridge, California.  This information related to subscriber
and utility information for 18526 Parthenia Street, Northridge,
California, the known location of the BLUE BANANA marijuana
dispensary.  The subscriber on the account was the Kester
Archwood Collective, telephone: 818-772-0420, SSN: XXX-XX-6129,
CADL: XXXX397, Irwin FEIGENBAUM, Address: 2393 OTONO CT,
Thousand Oaks, California, Corporation #C03208397.

26.  On October 26, 2010, at approximately 7:20 a.m., DEA
agents from the Ventura Resident Office and the Bakersfield
Resident Office, assisted by BPD detectives, executed a federal
search warrant at 2286 W. Adrian Street, Newbury Park,
California, ZELDES' residence.  At the time of the execution of
the warrant, ZELDES was not present. However, ZELDES'

girlfriend, SLAYBACK, who later died of a drug overdose in November, 2011, was present at the residence during the search warrant.

27. During the execution of the search warrant, SLAYBACK stated that a few years ago ZELDES, with the help of Dustin YORK and Davin JONES, had constructed a marijuana grow in the back bedroom of the residence. SLAYBACK stated that YORK and ZELDES eventually had a falling out and ZELDES had not been in contact with YORK since the arrests at the marijuana cultivation operation in Bakersfield. SLAYBACK stated that she did not know the relationship between NOLAN and ZELDES, other than that NOLAN and ZELDES had a business arrangement where NOLAN had purchased construction equipment from ZELDES and would rent it back to ZELDES. SLAYBACK stated that NOLAN had asked ZELDES to construct a marijuana cultivation operation at a building in Bakersfield on the property where NOLAN's tile cutting business was located. SLAYBACK stated ZELDES was supposed to be paid by NOLAN for the construction of the marijuana cultivation. However, NOLAN forced ZELDES out after the cultivation set-up and took over the operation. According to SLAYBACK, NOLAN owed ZELDES a lot of money. SLAYBACK stated that ZELDES had an arrangement with the owner of the BLUE BANANA and ZELDES constructed that facility. SLAYBACK stated

that Irwin FEIGENBAUM and Brain DIAMOND were the primary
financiers of the BLUE BANANA, along with some financial
involvement by NOLAN.

28.  On November 1, 2010, Resident Agent in Charge Carl
Beckett, Intelligence Research Specialist John McCain and your
affiant met with ZELDES at the DEA Bakersfield Resident Office
who, under the advice of his attorney came into the office of
his own free will to speak with us regarding the investigation.
During the meeting, ZELDES stated that he began cultivating
marijuana at his residence a few years ago, when the
construction business was slow and he was not working. ZELDES
stated he had known Joseph NOLAN for approximately 10 years and
worked on quite a few construction projects with NOLAN at Cross
Creek Building Center. SLAYBACK, ZELDES' girlfriend, owned a
construction company called "A Cut Above Construction Services
Inc.," where ZELDES worked and the company sold the
construction equipment to NOLAN, who moved it to Bakersfield,
California.  The equipment was sold to NOLAN to facilitate a
large project they were both working on.  NOLAN had a location
to set up, install and use the equipment and doing so made
financial sense, as opposed to having two separate work
locations.

29.  According to ZELDES, at the time the construction

22

equipment was being moved to Bakersfield, NOLAN stated he had a
vacant building and asked ZELDES if cultivating marijuana was
profitable.  ZELDES told NOLAN it had cost him approximately
$40,000 to $50,000 to build the cultivation room located at his
residence.  ZELDES stated that it was possible to make money;
however, it was difficult due to the initial financial outlay
of capital.

   30.  ZELDES stated that he hired some attorneys to look
into the numbers for the marijuana cultivation.  They told him
that anything over 1,000 marijuana plants could be prosecuted
federally; however, the federal government could do what they
want.  ZELDES stated that the attorney also informed him that
they would be taking a risk if there were over 1,000 marijuana
plants found at the location.

   31.  ZELDES acknowledged that he had built the marijuana
cultivation operation at the South Union location referenced
herein. ZELDES stated that NOLAN and Brian DIAMOND, each paid
half of the labor costs for the construction and the payments
were made in cash.  NOLAN would pay cash and would have ZELDES
generate invoices for slabs of granite to shield NOLAN's wife
from knowledge of the marijuana cultivation operation.  ZELDES
stated that he believed that NOLAN gave him no more than
$12,000 in checks. During the interview he did not make it

23

clear how much he purchased nor what amount was paid in cash or by check.

32.   ZELDES stated that he and Mark McGRATH had been friends for a very long time.  McGRATH had been living in Florida and business was slow.  ZELDES contacted McGRATH and told him that ZELDES had work in construction and cultivating marijuana. ZELDES stated that he and NOLAN financed McGRATH's move from Florida to Bakersfield to work at the marijuana cultivation operation located on Union Avenue.

33.   ZELDES stated that YORK contacted ZELDES the night before the day of the search warrant and stated he thought he had observed undercover police officers.  YORK went to and stayed at a hotel that night.  McGRATH convinced YORK that no police were at the location.  Toll records confirm that ZELDES was in contact with NOLAN and YORK during this time frame. ZELDES stated that both YORK and NOLAN told ZELDES that NOLAN was found at the location and NOLAN told officers that he did not know anything.  ZELDES stated that YORK's uncle, Joseph TAYLOR, and others called ZELDES for help.  ZELDES stated they needed to call NOLAN or DIAMOND, because he did not have any money.  ZELDES stated that it was NOLAN's building and that ZELDES had not received a check or any money out of the deal. ZELDES stated that he got screwed out of money. ZELDES believed

24

that all who were arrested thought ZELDES should help out with
the legal trouble, as he was involved and did not get arrested.

34.   ZELDES stated that he was hired to build everything
out (i.e., construct the marijuana cultivation operation) and
was promised the moon but was screwed in the deal.   ZELDES
stated that he was never paid or reimbursed for all of the
cultivation equipment that he contributed and some of it had
evidence labels on it, referring to the Ventura County Sheriff
evidence stickers.   ZELDES stated that he had paid $50,000 for
the cultivation equipment that was sent over to the Bakersfield
cultivation operation.

35.   On or about October 17, 2013, Jason Ralston FRANK,
was stopped by law enforcement on Interstate 180 in Iowa and
found to be in possession of four pounds of marijuana.
Following advice and waiver of his Miranda rights, FRANK
advised that he was transporting the marijuana for MARK ZELDES,
who had given him $10,000 to go to a house in Denver and pick
up the marijuana for delivery to a person on ZELDES' behalf in
Des Moines, Iowa.

36.   FRANK further indicated that ZELDES had moved to
Durango, Colorado following troubles with the police in
California.   FRANK said ZELDES had informed him that his "wife"

could not handle the pressure of the police investigation, took too many pills, and died as a result. FRANK indicted that he met ZELDES on Craig's List when ZELDES contacted him about an "Acroflow" table that FRANK was selling. Although ZELDES did not purchase the table, FRANK talked with ZELDES about a marijuana grow operation that he was setting up in Englewood, Colorado. FRANK advised ZELDES that he was an electrician and could wire the electricity for indoor marijuana cultivation operations. ZELDES and FRANK subsequently met in Erie, Colorado and ZELDES took FRANK to a rural location where he indicated that he wanted to set up a marijuana cultivation operation consisting of 64 grow lights, 4 flowering rooms and a vegetation room in the outbuilding on the property.

37. According to FRANK, ZELDES further advised that he had four other marijuana grow operations, had been growing marijuana for 30 years and had developed a deep water technique for "current culture" research. FRANK indicated that ZELDES could get 5 pounds of marijuana per plant using the technique he developed. In addition, ZELDES told FRANK that he "does fifty pounds 950 lbs) of marijuana a week, which he sells to people out of state." ZELDES also indicated that he has done 1,180 transactions through regular mail and has never been caught. ZELDES indicated to FRANK that he has made millions of dollars

through mail shipments of marijuana.

### CONCLUSION

38.  Based on my training and experience and the information contained within this Affidavit, I believe that probable cause exists to find that Mark Jeff ZELDES has knowingly and intentionally conspired with NOLAN, McGRATH, TAYLOR, YORK, DUNN, and others, known and unknown, to manufacture, to distribute, and to possess with intent to distribute 1,000 or more marijuana plants, a Schedule I controlled substance, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846.

39.  I swear that the facts presented herein are true and accurate to the best of my knowledge.

Randall Hoover
DEA Special Agent
Bakersfield Resident Office

SWORN AND SUBSCRIBED TO BEFORE ME
THIS _13TH_ DAY OF FEBRUARY , 2014.

Jennifer Thurston
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF CALIFORNIA

Reviewed and approved as to form this
11th day of February, 2014.

/s/ Karen A. Escobar
KAREN A. ESCOBAR
Assistant U.S. Attorney